UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **DESTINY HEARD**, | 19-cv-10865 |
| Plaintiff, | |
| v. | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| **DETROIT PUBLIC SCHOOLS COMMUNITY DISTRICT a/k/a DETROIT PUBLIC SCHOOLS, AND CHARLES BRAZIEL**, | |
| Defendants. | |

In December of 2015, 15-year-old Destiny Heard, a high school student at Cass Technical High in Detroit, was restrained and detained by school officials for allegedly disruptive behavior. Now the Plaintiff in this lawsuit, Heard claims that Defendant Detroit Public Schools Community District and one of its police officers, Defendant Charles Braziel, violated her constitutional rights and committed intentional torts against her. Defendants move for summary judgment, asserting immunity under various federal and state law doctrines.

For the reasons that follow, Defendants' motion for summary judgment will be **GRANTED IN PART** and **DENIED IN PART**.

# I.   Background[1]

Thinking that her elevator pass was still valid, Plaintiff Destiny Heard attempted to get on the second-floor elevator while on her way to class. ECF No. 1, PageID.8-9. She had previously been issued an elevator pass because of an ankle injury. ECF No. 16-3, PageID.163. A teacher on the elevator, however, notified Plaintiff that her elevator pass had expired, that she could not ride the elevator, and that she had to use the stairs. ECF No. 16-3, PageID.185. Plaintiff claims that the school official on the elevator told Plaintiff she was trying to get back on the elevator. Plaintiff said she was not trying to do so, but the school official said she was called over by a private security officer. ECF No. 16-2, PageID.152. The school official and the private security officer inspected her identification card and then let her go.

As Plaintiff was heading up the stairs, a second private security officer and the assistant principal stopped her to question her about using the elevator. *Id.* at PageID.153. Plaintiff claims that as she was explaining her actions, the assistant principal interrupted her to say that

---

[1] The following sequence of events is based on the following sources: the deposition testimonies of Plaintiff Heard and Defendant Braziel, written statements that Heard made the day of the incident, a written statement that Defendant Braziel made the day of the incident, a crime report that Defendant Braziel made the day after the incident, an affidavit that Defendant Braziel made in October 2020, and a video recording that captured some but not all of the altercation. *See* ECF Nos. 16-1, 16-2, 16-3, 16-4, 16-5, 16-6, and 16-7.

she was upset. *Id*. Plaintiff then asserts that was when the assistant principal began to raise his voice at her. Plaintiff asked the assistant principal if they could speak in his office instead, but when the assistant principal continued to yell at her, she put on her headphones to tune him out. *Id*. At that point, a Detroit Public Schools Community Officer, Defendant Braziel, approached Plaintiff and told her that he was going to take her mobile phone. *Id*. at PageID.154. After Plaintiff refused, Defendant Braziel stated that she was coming with him. *Id*. Plaintiff refused again, stating that she was afraid of Defendant Braziel, and that she was going to use her mobile phone to call her mother. *Id*.

The record contains competing versions as to what happened next. Plaintiff claims that when Defendant Braziel reached for Plaintiff's mobile phone, she reacted by pulling her mobile phone back towards her. *Id*. Defendant Braziel claims that Plaintiff elbowed him when he tried to confiscate her mobile phone, while Plaintiff denies that she elbowed or made any swinging motion with her arm. ECF No. 16-3, PageID.190. Defendant Braziel states that he then told Plaintiff he was detaining her for assault. ECF No. 16-4, PageID.207. It is undisputed that Plaintiff and Defendant Braziel ended up on the ground against the second-floor stairs. Plaintiff claims that Defendant Braziel pushed and tackled her down the stairs. ECF No. 16-2, PageID.154. Defendant

Braziel, however, claims that they "fell together down against to the stairs." ECF No. 16-4, PageID.206.

Plaintiff maintains that Defendant Braziel next urged her to get up, but she refused and asked that he call an ambulance for her injuries. ECF No. 16-2, PageID.154. After she refused, Plaintiff states that Defendant Braziel again urged her to stand up or be dragged away. *Id*. She then testifies that Defendant Braziel grabbed her arm and dragged her from the stairway to a corner of the hallway on the second floor. *Id*. at PageID.154-55. At this point, Plaintiff and Defendant emerge within view of a surveillance camera which recorded the subsequent events.[2]

In that video, which is five minutes long, Defendant Braziel is seen pulling Plaintiff into the hallway. *See* ECF No. 16-1, at timestamp 08:26:40. With Plaintiff under his physical control, Defendant moves Plaintiff toward the wall—from the video it is unclear whether

---

[2] Although Defendants filed the video footage in the traditional manner, ECF No-1, the Court is not able to access the physical copy submitted as a result of the Eastern District of Michigan's COVID-19 pandemic restrictions, which have limited in-person access to the courthouse. As an alternative, Defense counsel submitted a digital link to the Court. *See* fred hampton, *Cass Tech-FTV-210-2nd Flr.-Near Bookstore-facing South*, YOUTUBE (May 17, 2021), https://perma.cc/X2H5-MFF8. At the hearing on April 14, 2021, both parties agreed that this digital copy is a fair and accurate version of the video filed as ECF No. 16-1. Therefore, references to the timestamp in the digital copy will be cited in place of the physical copy.

Plaintiff's head hits the wall, but it does appear that she contacts the wall. Plaintiff maintains that Defendant Braziel slammed her against the wall and caused her to hit her head and fall. ECF No. 16-2, PageID.155. Defendant Braziel asserts that Plaintiff "threw herself into the wall," causing her to hit herself on the head. ECF No. 16-4, PageID.208. Then Defendant moves Plaintiff a few steps down the hall and they struggle over her mobile phone. The phone ends up on the floor and as Defendant Braziel releases Plaintiff from his control in order to bend down to pick up the mobile phone, Plaintiff walks quickly away from him, but he retrieves her. 08:26:53-08:27:03.

Then Defendant Braziel can be seen moving Plaintiff back toward the wall, in the corner, and Plaintiff appears to sit down on the ground. Video at 08:27:05. Another officer, a private security officer, enters the frame at 08:27;10. Defendant Braziel appears to hand Plaintiff's phone to this officer, and then a female private security officer arrives at 08:27:29. The officers all appear to be talking to Plaintiff, who is sitting on the floor with her back against the wall. At 08:28:25 the female officer appears to be making a call on Plaintiff's phone. At 08:29:00, she hands the phone to Defendant Braziel, who then holds a conversation with someone, possibly Plaintiff's mother according to Defendant Braziel's deposition testimony, ECF No. 16-5, PageID.239-40, until approximately 08:29:41.

During this time, the female security officer can be seen crouching down and speaking with Plaintiff. At 08:30:10, all three officers have been speaking with Plaintiff, and another woman, possibly an administrator or teacher, arrives and speaks with the officers. At 08:30:33, in the presence of the female staff person, Defendant Braziel begins to try to pull Plaintiff away from the wall. She resists and does not get up.

Although it is not possible to tell with certainty, it may be that Defendant threatened to pepper spray Plaintiff at approximately 08:30:40, because Plaintiff can be seen pulling up her jacket and covering her face. From 08:30:40 until 08:30:58, Defendant Braziel and the female officer struggle somewhat with Plaintiff—it is not clear when pepper spray is used. Both parties agree that while Plaintiff was sitting in the corner in what appears to be a fetal position, Defendant Braziel warned her that if she continued to refuse to comply, he would use his pepper spray on her. ECF No. 16-2, PageID.155; ECF No. 16-4, PageID.208.

Between 08:30:58 and 08:31:26, Defendant and the female officer are standing over Plaintiff, but it does not appear that they are struggling. The male officer and female staff person are also present observing during this time. At 08:31:26, Defendant Braziel can be seen attempting to pull Plaintiff up from the floor and she appears to be resisting. Between 08:31:26 and 08:31:45, the officers have difficulty

forcing Plaintiff to get up. It does appear that Defendant Braziel kicks at Plaintiff at one point, and she is pulled up and then falls back down. Although Plaintiff denies in her testimony that she tried to kick or bite Defendant Braziel while she was sitting in the corner, ECF No. 16-3, PageID.191-92, he asserts that she tried to bite his right hand when he was trying to restrain her. ECF No. 16-4, PageID.208.

At 08:31:46, the male private security guard succeeds in lifting Plaintiff, and wraps his arms around her waist from behind, and carries her as she is kicking, for several steps. She appears to begin walking at timestamp 08:31:54 and the entire group exits the view of the camera.

Once detained, Plaintiff was taken to an office in the school where she received medical attention for the pepper spray in her eyes. ECF No. 16, PageID.131. Following the incident, Defendant Braziel prepared an incident report, which a local prosecutor used to bring charges for disorderly conduct. ECF No. 1, PageID.12-13; ECF No 21, PageID.300. A judge in the Wayne County Juvenile Court, however, dismissed those charges. *Id*. at PageID.13.

As a result of the events, Plaintiff filed suit in Michigan state court alleging that Defendants violated the Fourth and Fourteenth Amendments of the United States Constitution through 42 U.S.C. § 1983. *See* ECF No. 1. Specifically, that Defendant Braziel's use of force described above constitutes excessive force and unlawful search and

seizure, and the subsequent criminal charges constitute malicious prosecution. *See id*. Plaintiff also alleges that Defendant Braziel committed Michigan law intentional tort violations, including assault and battery, battery, malicious prosecution, and false arrest. *See id*. As to Defendant Detroit Public Schools, Plaintiff alleges that it is liable for constitutional violations because Defendant Braziel acted pursuant to its policies and procedures, and because it approved his conduct. *See id*.

Defendants removed the case to this Court and now moves for summary judgment on the basis that they are immune from liability against such claims. Defendant Detroit Public School asserts that it is entitled to municipal immunity. Defendant Braziel contends that he is entitled to qualified immunity as to the federal constitutional violation claims, as well as state law immunity from the tort claims. *See* ECF No. 16.

These matters are fully briefed and the Court heard oral arguments on the motion for summary judgment on April 14, 2021.

## II.  Legal Standard

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact such that the movant is entitled to a judgment as a matter of law." *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013);

*see also* Fed. R. Civ. P. 56(a). A fact is material only if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

On a motion for summary judgment, defendants have the initial burden to show that there is an absence of evidence to support a plaintiff's case. *Selby v. Caruso*, 734 F.3d 554 (6th Cir. 2013); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the non-moving party "may not rest upon its mere allegations or denials of the adverse party's pleadings, but rather must set forth specific facts showing there is a genuine issue for trial." *Ellington v. City of E. Cleveland*, 689 F.3d 549, 552 (6th Cir. 2012).

But where, as here, the defense raises qualified immunity, the plaintiff must bear the burden of showing that the defendant is not entitled to such immunity under the test established in *Harlow v. Fitzgerald* in order to survive a motion for summary judgment. 457 U.S. 800, 818 (1982); *Everson v. Leis*, 556 F.3d 484, 494 (6th Cir. 2009). The *Harlow* test has two prongs. First, a court determines whether officer's conduct violated a federal right. If so, then a court must determine whether that right was "clearly established" at the time, such that a reasonable officer would have known of it. 457 U.S. at 818. However, even when a defendant asserts qualified immunity as an affirmative defense in a motion for summary judgment, "the evidence of the nonmovant is to

be believed, and all justifiable inferences are to be drawn in his favor." *Tolan v. Cotton*, 572 U.S. 650, 651 (2014). A court has discretion to determine the order in which it considers these two prongs. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

### III. Discussion

Plaintiff raises nine claims in six counts; four of which are claims alleging constitutional rights violations under 42 U.S.C. § 1983, with the other five alleging various intentional torts under Michigan law. *See* ECF No. 1. One of the § 1983 claims alleges that Defendant Detroit Public Schools failed to supervise, adequately train, and control or discipline Defendant Braziel. *Id.* at PageID.15-16. The remaining claims are against Defendant Braziel in his capacity as a police officer working for Defendant Detroit Public School.

Defendants respond by moving for summary judgment on the basis of municipal and governmental immunity conferred by Michigan statute, Mich. Comp. Laws § 380.1312, and Michigan case law. *See Odom v. Wayne County*, 482 Mich. 459, 480 (2008).

The Court addresses Plaintiff's claims in three sections: first, whether Defendant Braziel is entitled to qualified immunity on the federal claims; second, whether Defendant Detroit Public School is entitled to municipal immunity on the federal claims; and third, whether

Defendant Braziel is entitled to governmental immunity as to the individual Michigan tort law claims.

**a. Section 1983 claims against Defendant Braziel.**

Plaintiff alleges in Count I that Defendant Braziel is liable for excessive force, unlawful search and seizure, and malicious prosecution in violation of her civil rights protected pursuant to § 1983. The Court will address the excessive force and unlawful search and seizure claims first. When a law enforcement officer uses force to detain a person, such claims of unlawful seizure fall within Fourth Amendment jurisprudence. *Graham v. Connor*, 490 U.S. 386, 396-97 (1989).

Here, there are three alleged instances of excessive force. In the first instance, which happened on the stairway, Plaintiff claims that Defendant Braziel pushed and tackled her to the ground after she allegedly acted dismissively towards the assistant principal, disobeyed the security officials, and did not comply with his attempt to confiscate her mobile phone. ECF No. 16-2, PageID.154; ECF No. 16-5, PageID.230. Although "Plaintiff had committed no crime, and was no immediate threat," Defendant Braziel justifies his use of force because Plaintiff "clearly disobeyed, and actively resisted." *Id*. Defendant Braziel insists that in this first instance he "acted with minimal, reasonable force." *Id*.

In the second and third instances, which were both captured in the surveillance footage, Plaintiff claims first that Defendant Braziel used

excessive force when he threw her against the wall and caused her to hit her head. Plaintiff secondly claims that Defendant Braziel used excessive force when he used pepper spray against her and kicked her when she was on the ground in the corner of the hallway.

As to these two instances of the use of force, Defendant Braziel responds that the video "clearly shows that Plaintiff actively resisted, struggled with, and kicked Officer Braziel before he pepper sprayed Plaintiff." ECF No. 16, PageID.138. In addition, Defendant Braziel "repeatedly warned Plaintiff that he was going to pepper spray her if she refused to comply." *Id*. In the kicking and pepper spraying instance, Defendant Braziel justifies his use of force because Plaintiff "posed a clear threat of injury to officer Braziel (sic) by repeatedly kicking him" and after she tried to bite his right hand. *Id*.

The Supreme Court in *Graham v. Connor* established the framework for analyzing a claim that law enforcement officials "used excessive force in the course of making an arrest, investigatory stop, or other 'seizure' of his person." 490 U.S. at 388. "The 'reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*. at 396. "'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment." *Id*. (citations omitted). The question is "whether the

officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id*. at 397.

The Sixth Circuit in *Goodwin v. City of Painesville* articulated "[t]hree important but non-exhaustive factors" in guiding a court's analysis. 781 F.3d 314 (6th Cir. 2015) (citing *Graham*, 490 U.S. at 396). First, the severity of the crime at issue. *Id*. at 321. Second, "whether the suspect poses an immediate threat to the safety of the officers or others." *Id*. Finally, "whether he is actively resisting or attempting to evade arrest by flight." *Id*.

In *Goodwin*, the plaintiff alleged that police officers used excessive force against him when one of the officers tasered him for twenty-six seconds. *Id*. at 317. The officers were responding to an emergency call from a neighbor, who stated that there was a disruptive party occurring at the plaintiff's residence. When the officers arrived, a neighbor stated that she heard the plaintiff making threats towards others at the party and warned that he would harm the officers if they tried to enter his home. The officers approached the house party and directed the plaintiff to come with them. The plaintiff refused, and one of the officers tasered him. The plaintiff went into cardiac arrest and was hospitalized for nearly two weeks. Thereafter, he suffered serious brain injuries "and his mental functioning remains greatly impaired." *Id*. The plaintiff filed suit

alleging, among other claims, that the officers used excessive force in detaining him. The officers asserted the defense of qualified immunity, which the district court denied.

The Sixth Circuit affirmed the denial of qualified immunity because "*Graham* indicates that a jury could reasonably find that Officer Soto violated [the plaintiff's] Fourth Amendment right to be free from excessive force." *Id.* at 325. Among other facts, the court determined that the police officers violated the plaintiff's constitutional rights because the crime was not serious, there was little basis to believe that the plaintiff was a threat to the officers or others, and crucially, "[the plaintiff's] initial resistance was at most a passive refusal to comply with a single request to leave his residence." *Id.*

*Goodwin* also held that the plaintiff's rights to be free from excessive force were clearly established. *Id.* at 326; *see also C.B. v. City of Sonora*, 769 F.3d 1005, 1030-31 (9th Cir. 2014) (en banc) (holding that it was clearly established that "police use of force in response to school-related incidents had to be reasonable in light of the circumstances and not excessively intrusive."). At the time of the violation, "'[t]he general consensus among our cases is that officers cannot use force…on a detainee who has been subdued, is not told he is under arrest, or is not resisting arrest.'" *Id.* (citing *Grawey v. Drury*, 567 F.3d 302, 314 (6th Cir. 2009)). Moreover, the court determined that "absent a statement that he

was under arrest or an order to get on the ground or something similar, it was not objectively apparent that the Officers intended to take [plaintiff] into custody, or that he was not free to remain in his own home." *Id*.

Having reviewed Sixth Circuit jurisprudence on claims alleging excessive force by a police officer, given that Defendant Braziel here says that his level of force was justified by Plaintiff's resistance, the Court consults case law on the question of what sort of conduct constitutes active resistance. In *Eldridge v. City of Warren*, the Sixth Circuit considered "[w]hat constitutes 'active resistance' by a suspect that justifies a police officer's use of force?" 533 Fed App'x 529, 530 (6th Cir. 2013). The plaintiff was a diabetic driver found in a vehicle parked on the lawn of a condominium complex. *Id*. Because the plaintiff was nonresponsive and was parked in an unusual manner, the police officers who responded to the scene suspected him of being drunk. *Id*. at 530. The officers repeatedly instructed plaintiff to step out of his vehicle, but he did not obey their commands. *Id*. The situation grew tense after the plaintiff repeatedly ignored the officers' commands and the officers warned plaintiff that he would be tasered. *Id*. at 531. After two minutes of trying to get the plaintiff to exit his vehicle, one of the officers used his taser on him.

The officers later learned that the plaintiff was a diabetic who was suffering from a hypoglycemic episode, and was therefore unable to respond to their commands. *Id*. The plaintiff filed suit in federal court alleging violations of his constitutional right to be free from excessive force. The officers moved for summary judgment on the basis of qualified immunity, but the motion was denied by the district court.

In upholding the district court's decision, the Sixth Circuit Court of Appeals in *Eldridge* ruled that "noncompliance alone does not indicate active resistance; there must be something more." *Id*. at 535. The court cited as examples of active resistance "a verbal showing of hostility" or "a deliberate act of defiance using one's own body." *Id*. In the cases cited to illustrate behavior constituting active resistance, the common thread was that the person remained noncompliant even after police officers gave objectively clear warnings and made repeated attempts to obtain compliance. *See id*. Indeed, such acts of noncompliance were "not evaluated in isolation; rather, it was the final straw in a serious of consciously-resistive acts." *Id*. at 534 (citing *Caie v. West Bloomfield Township*, 485 Fed. App'x 92 (6th Cir. 2012)). The court affirmed the denial of qualified immunity because the plaintiff's right to be free from physical force when being merely noncompliant—but nothing more—was clearly established.

In the case before the Court, Defendant Braziel contends that his use of force was reasonable because Plaintiff was actively resisting from the moment he made contact with her. ECF No. 16-5, PageID.229. He cites *Rudlaff v. Gillispie* for the proposition that because Plaintiff resisted his commands, he was authorized to escalate his use of force as he deemed appropriate. ECF No. 16, PageID.136-37. As that case points out, "[u]sing 'excessive force' during an arrest is unreasonable and thus violates the Fourth Amendment." *Rudlaff v. Gillispie*, 791 F.3d 638 641 (6th Cir. 2015) (citing *Graham*, 490 U.S. at 394-95)). But Sixth Circuit case law also states that "it is not excessive force for the police to taser someone (even multiple times) when the person is actively resisting arrest." *Id*. at 641 (citing *Hagans v. Franklin Cnty. Sheriff's Office*, 695 F.3d 505, 509 (6th Cir. 2012)). Active resistance includes "physically struggling with, threatening, or disobeying officers," *Cockrell v. City of Cincinnati*, 468 Fed. App'x 491, 495 (6th Cir. 2012), as well as "refusing to move your hands for the police to handcuff you, at least if that inaction is coupled with other acts of defiance." *Rudlaff*, 791 F.3d at 641 (citations omitted). However, active resistance does not include being compliant, having stopped resisting, or having already been detained. *See Cockrell*, 469 Fed. App'x at 496 (collecting cases).

The question therefore is whether Defendant Braziel's use of force as to any of the three instances described above was reasonable in light of Plaintiff's disruptive behavior and noncompliance with his commands.

### i. Defendant Braziel tackling Plaintiff (first use of force).

In the first instance where force was used, Plaintiff claims that Defendant Braziel pushed and tackled her to the ground after she acted dismissively towards the assistant principal, disobeyed the security officials, and moved away from his attempts to confiscate her mobile phone. ECF No. 16-2, PageID.154; ECF No. 16-5, PageID.230.

Although Defendant Braziel conceded that at the moment of first contact, "Plaintiff had committed no crime, and was no immediate threat," he justifies his use of force because he claims that she elbowed him when he tried to confiscate her mobile phone. *Id*. This, Defendant argues, shows that Plaintiff "clearly disobeyed, and actively resisted." *Id*. Thus, Defendant Braziel maintains that he "acted with minimal, reasonable force." *Id*.

Defendant Braziel concedes that two out of the three *Graham* factors are not at issue here because he admits that Plaintiff "committed no crime, and was no immediate threat." ECF No. 16, PageID.137. In applying the law from the use of force cases, we must keep in mind the distinctive context at issue here. These events took place in a brightly lit high school hallway, not in a high crime drug market or a dark alley. A

teenage high school student tried to use an expired elevator pass and then acted dismissively—but nothing more—when school officials responded and attempted to control her. Thus, because of Defendant Braziel's admissions, the dispositive analysis is narrowed to whether Plaintiff actively resisted in a manner that warranted Defendant Braziel tackling her to the ground and then dragging her along the hallway when she did not comply with his commands. *See Eldridge*, 533 Fed. App'x at 533.

The level of Plaintiff's resistance to Defendant Braziel's control, however, is a material fact about which the evidence diverges. Plaintiff claims that Defendant Braziel tackled her to the ground after she pulled away from him. In contrast, Defendant Braziel claims that he had to use force after Plaintiff raised her arm to elbow him in the chest. Accepting Plaintiff's version would mean that Defendant Braziel is not entitled to qualified immunity because he placed his hands on her without reasonable justification, merely because she walked away. But accepting Defendant Braziel's version would entitle him to qualified immunity and summary judgment in his favor because assaulting a police officer is clearly the kind of active resistance that would justify force being used by the officer. The Court is therefore faced with this question: what is the legal standard in a motion for summary judgment where the question of qualified immunity is dependent upon divergent views of the facts?

A court must reject a motion for summary judgment based on qualified immunity where "the legal question of immunity is completely dependent upon which view of the facts is accepted by the jury." *Brandenburg v. Cureton*, 882 F.2d 211, 215-16 (6th Cir. 1989); *see also Baynes v. Cleland*, 799 F.3d 600 (6th Cir. 2015) (reversing the district court and holding that officers were not entitled to summary judgment based on qualified immunity on plaintiff's excessive force claim because plaintiff "demonstrate[d] a genuine issue of material fact as to whether there has been a constitutional violation."). The Sixth Circuit has further held that "[i]n the summary judgment posture, the case must go to the jury" when a district court finds that either "there are genuine issues of material of fact as to whether [the Officers] violated [the plaintiff's] Fourth Amendment rights in an objectively reasonable way" or "whether those rights were clearly established at the time of [the plaintiff's] arrest such that a reasonable officer would have known that his conduct violated them." *Goodwin*, 781 F.3d at 321 (citations omitted). "Once defendants satisfy their initial burden of demonstrating that they were acting within the scope of their authority, a plaintiff bears the burden of proving that defendants are not entitled to qualified immunity." *Humphrey*, 482 F.3d at 846; *see also Austin v. Redford Tp. Police Dept.*, 690 F.3d 490, 496 (6th Cir. 2012).

Where, as here, a plaintiff raises a genuine issue of material fact as to whether her constitutional rights have been violated, qualified immunity must be denied and the case must go to the jury. In *Austin v. Redford*, the Sixth Circuit affirmed the district court's denial of qualified immunity. 690 F.3d at 496. In that case, police officers attempted to pull over plaintiff for speeding. Instead of stopping, the plaintiff led the officers on a high-speed car chase. *Id.* at 493-94. Once the plaintiff stopped, he visibly discarded his weapon through the vehicle window, and exited the vehicle. *Id.* at 494. Video footage from the officers' cameras captured some of the events, but "the parties dispute some events not depicted in the video and the inferences to be drawn from the video." *Id.*

Plaintiff asserted that he complied with the officers' commands and was not behaving in an aggressive manner. The plaintiff also claimed that "the police dog was deployed on him three times, including once while he was already on the ground," *Id.*, and that an officer tasered him a third time "while he was pinned on the ground by another officer." *Id.* The officers, on the other hand, claimed that plaintiff was noncompliant, moved his hands aggressively, that the police dog was deployed only once and was immediately called back, and that the taser was deployed "only twice by [the officer], the second time when [the plaintiff] attempted to get up from the ground." *Id.*

Despite the video footage, a "factual dispute existed regarding whether Defendants violated [the plaintiff's] constitutional rights." *Id.* at 496. The district court, after viewing the evidence "in the light most favorable to [the plaintiff], concluded that the plaintiff "posed no significant threat to the officers once he was on the ground." *Id.* at 496. The district court relied on video footage that preceded the alleged use of the taser to conclude that it was not demonstrably false that the plaintiff was nonresistant at the time the officer deployed the taser. Hence, the district court held that a disputed fact existed whether the plaintiff was actually subdued and nonresistant. *Id.* at 497.

Similarly, the district court found that there was an issue of material fact as to whether the plaintiff "was resisting or threatening the officers at the time [an officer] deployed his police dog." Video footage showed that prior to the deployment of the police dog, the plaintiff stopped any movement towards the officers, had his hands raised with his palms open, and then "falling backward into his car after [an officer] deploys his Taser." *Id.* at 497.

The Sixth Circuit affirmed the denial of qualified immunity because the district court's findings about whether there was a genuine issue of material fact was not "demonstrably false." *Id.*; *see also Gradisher v. City of Akron*, 794 F.3d 574, 586 (6th Cir. 2015) (reversing district court's granting of qualified immunity because whether plaintiff

"resisted or not and whether he was given an opportunity to comply with commands before, and while, being tasered are material facts in dispute.").

A court in this district similarly considered whether a material question of fact precludes summary judgment on a plaintiff's excessive force claim. *Ferchak v. Burton* denied a defendant officer's assertion of qualified immunity in a case alleging violations of constitutional rights when the defendant officer used excessive force in effectuating an arrest. 2021 WL 778910, at *1 (E.D. Mich. 2021) (Davis, J.).

In *Ferchak*, the plaintiff had been out drinking at a bar with a friend. *Id*. They returned to the home of plaintiff, who offered his friend the bedroom to sleep in while he slept on the couch in the living room. Plaintiff's friend, however, became agitated and confrontational. Plaintiff called the police, which made his friend even more upset. When the police arrived, the plaintiff let them into his home to speak to his friend. After the officers learned that the friend had struck plaintiff, the officers began to arrest the friend for assault. *Id*. at *1-*2. As the officers dragged the arrested friend to the front yard, the plaintiff attempted to interject and persuade the officers to not arrest his friend.

At this point, the parties presented different versions of what happened next. The plaintiff claimed that he was observing the arrest from several feet away, while the officers testified that plaintiff kept

coming up to the officers and hovering over them while the arrested friend was resisting arrest on the front lawn. Observing that the officers were being rough with the friend while she was already handcuffed and subdued, the plaintiff decided to begin filming the arrest. As another officer arrived at the scene, plaintiff claims that the officers ordered the recently arrived officer to stop plaintiff from filming and to seize his phone. *Id.* at *3.

When the officer directed to seize plaintiff's phone began to charge at plaintiff, the plaintiff claimed he instinctively raised his arms to protect himself as the officer "punched [plaintiff] in his right cheek area." *Id.* at *2. The officer, meanwhile, claimed that the plaintiff "raised his fist and cocked his arm back." *Id.* at *3. Only then, according to the officer, did he strike plaintiff "in the face with the side of his hand." *Id.* A neighbor who witnessed the entire scene corroborated the plaintiff's version of events, while the other officers' testimonies corroborated the defendant officer's version of events. *Id.*

Judge Davis reasoned that concluding that plaintiff's actions consisted of active resistance justifying use of force "would require the court to accept [the officer's] version of the facts as true, something it may not do on a motion for summary judgment." *Id.* at *6 (citing *Gradisher*, 794 F.3d at 586). That is because whether the plaintiff's conduct consisted of passive resistance would mean that "the use of

force would likely be unconstitutional." *Id*. But if the officer's testimony that the plaintiff's passive resistance "paired with verbal antagonism or a show of physical force (here, the raised fist alleged by [the officer])," then use of force was likely constitutional. *Id*. Thus, *Ferchak* held that "the jury must sort out whether [the plaintiff] raised his hand (or fist) *before* [the officer] initiated the strike or whether [the plaintiff] raised his hand (or first) *in response* to [the officer's] impending strike." *Id*. at *7. (emphasis in original).

Taking the record in this case in the light most favorable to Plaintiff, she has raised a genuine issue of material fact as to whether Defendant Braziel violated her constitutional right to be free from excessive force in laying hands on her in the first instance. To be sure, Plaintiff was noncompliant. But "noncompliance alone does not indicate active resistance; there must be something more." *See Eldridge*, 533 Fed. App'x at 533. Defendant Braziel points to the fact that he had to make an on-the-spot judgment in the face of a "defiant person who is actively resisting his commands while verbally hostile." ECF No. 16, PageID.137-38. However, Plaintiff claims all she did was withdraw herself from the situation when the assistant principal began to raise his voice at her. *Id*. Putting on headphones to tune out one's environment—or one's authority figures—is passive, rather than "active" resistance.

Moreover, the record is unclear whether Defendant Braziel gave Plaintiff enough time to obey let alone process his commands. It is not established, for example, whether Defendant Braziel warned Plaintiff about confiscating her mobile phone before he tried to lay hands on her and then either tackled her or fell to the ground. And even if Defendant Braziel gave a warning before using force, that only shows he gave a *single* verbal warning and then immediately used the force that caused them to fall to the ground.

Thus, this record raises an issue of material fact as to whether Defendant Braziel's use of force was objectively reasonable under the circumstances. *See Eldridge*, 533 Fed. App'x at 533 ("Generally, a confrontation leading to an excessive-force suit unfolds in a manner where the suspect causes the officers to be exposed to volatility, hostility, and danger in a way that increases with the passage of time, thus justifying [and often requiring] the use of force."). Furthermore, Plaintiff, as in *Goodwin*, had no reason to be aware she was being detained. *See* 781 F.3d at 326 ("[A]bsent a statement that he was under arrest or an order to get on the ground or something similar, it was not objectively apparent that the Officers intended to take Mr. Nall into custody.")

Plaintiff states that she had placed her headphones on and that Defendant Braziel said he was taking her mobile phone, and nothing more. ECF No. 16, PageID.137-38. Taking Plaintiff's version of events as

true, Defendant Braziel's response of tackling her to the ground took place without adequate justification or warning.

Considering Defendant Braziel's version of events, he maintains that he told Plaintiff he was going to confiscate her phone after she put on her headphones. ECF No. 16-5, PageID.229 ("I reached over and just asked her to take her headphones out of her ear."). After they both fell to the ground, according to his deposition testimony, Defendant Braziel then told Plaintiff "that she was detained for elbowing." *Id*. at PageID.231.

While Defendant Braziel claims that Plaintiff was actively resisting after she elbowed him in the chest, Plaintiff denies having ever elbowed or raised her arms with an intent to strike him. The Court is not permitted to accept one party's version of events over the other in a motion for summary judgment. The resolution of this factual dispute is left to the jury in a trial. Thus, because Plaintiff has raised an issue of material fact as to whether she actively resisted Defendant Braziel's control, Defendant Braziel is not entitled to qualified immunity for laying hands on Plaintiff, tackling or causing her to fall to the ground and then dragging her by her arm along the hallway.

## ii. Plaintiff's claim that Defendant Braziel threw her against the wall (second use of force).

The second instance of force was captured by surveillance camera. And where the officers have a video recording the events in question, this Court must "'view [] the facts in the light depicted by the videotape.'" *Rudlaff*, 791 F.3d at 639 (citing *Scott v. Harris*, 550 U.S. 372, 378 (2007)). Plaintiff's second claim is that Defendant Braziel used excessive force when he grabbed her by the arm from the stairs and then slammed her against the wall, causing her to hit her head and fall. ECF No. 16-2, PageID.155. According to Plaintiff, after she stated that she was afraid of Defendant Braziel and that she needed an ambulance for her injuries:

> [Defendant Braziel] grabbed my arm and dragged me from the stairs by main office to the bookstore in dark, in the corne (sic) slamming up against the wall, causing me to hit my head and fall.

*Id.* at PageID.154-55.

Defendant Braziel, on the other hand, denies that he threw Plaintiff against the wall. ECF No. 16-4, PageID.210. Instead, he maintains that Plaintiff "threw herself into the wall," which led to her hitting her head. *Id.* Although this incident was captured in the surveillance video at approximately 8:27:03, ECF No. 16-1, it is not clear from viewing the video whether Plaintiff was pushed into the wall, accidently collided with the wall, or, as Defendant claims, "threw herself" into the wall. So,

"viewing the facts in the light depicted by the videotape" does not resolve the dispute.

As in the first instance, the application of qualified immunity is dependent upon accepting Defendant Braziel's version of events over Plaintiff's. *See Gradisher*, 794 F.3d at 586. This the Court cannot do on a motion for summary judgment. Plaintiff has also raised a genuine issue of material fact as to whether Defendant Braziel used excessive force when Plaintiff hit her head against the wall, causing her to fall to the ground. For this reason, Defendant Braziel's motion for summary judgment on the basis of qualified immunity as to the second instance is also denied. *See id.*

### iii. Defendant Braziel pepper spraying Plaintiff (third use of force).

The third instance of the use of force was also captured on surveillance footage. By this point in the sequence of events, at the 8:30:33 mark in the video, it was clear that Plaintiff was actively resisting and engaging in disorderly conduct. Hence, Defendant Braziel had probable cause to detain her. Moreover, Plaintiff's active resistance to Defendant Braziel's attempts to detain her constituted an immediate threat to the officials. *See Eldridge*, 533 Fed. App'x at 533. The video shows Plaintiff sitting on the ground in a corner of the hallway, with several school officials appearing to try to get her under control, including, for much of the time, a female officer—which Plaintiff claims

is what she wanted. She is visibly resisting, kicking, and, according to Defendant Braziel, at one point attempted to bite Defendant Braziel's right hand. ECF No. 16-4, PageID.210.

Plaintiff's conduct as viewable in the video shows active resistance. *See* ECF No. 16-1. Her demeanor towards the officials shows that she refused to stand up, making it difficult for Defendant Braziel and the other school officials to detain her. *See id.* The video also shows that for a period of time, Defendant Braziel deferred to the female private security officer, from whom Plaintiff claims she was willing to take directions. However, the video shows that Plaintiff did not comply with the female private security officer's directions either. Instead, Plaintiff still refused to stand up and be escorted away. ECF No. 16-2, PageID.155. It is not disputed that Defendant Braziel "repeatedly warned Plaintiff that he was going to pepper spray her if she refused to comply." ECF No. 16, PageID.138. Plaintiff was eventually detained and received medical aid, but only after, according to an investigation by Detroit Public Schools Department of Police, she was "kicking and screaming" and a private security officer carried her away. ECF No. 21-2, PageID.311.

Plaintiff cites *Harris v. City of Cadillac* as an example of where a district court held that a police officer's conduct constituted excessive force, and therefore rejected a defendant school officer's claim of qualified immunity after being sued under § 1983. ECF No. 21, PageID.294 (citing

499 F. Supp.2d 904 (W.D.M.I. 2007)). In that case, plaintiff was a teenage female student attending a local junior high school. *Id*. at 905. The school principal observed plaintiff in the cafeteria, where she was prohibited from entering as a previous disciplinary measure. *Id*. A school officer dispatched to confront plaintiff approached her with pepper spray already in hand. *Id*. Although plaintiff was compliant, the school officer "pepper sprayed [plaintiff] in the face and pushed [plaintiff] into a wall." *Id*. The school officer then "grabbed [plaintiff] by her clothing and her hair to pull her to her feet and then dragged her to a ladies' washroom where [the school officer] verbally abused [plaintiff]." *Id*.

The court found that the school officer pepper spraying plaintiff constituted excessive force due to the "lack of significant attempts to resolve the interaction without prompt use of physical force" and because plaintiff complied with the school officer's orders. As such, qualified immunity did not protect the school officer "from liability concerning these incidents because Fourth Amendment rights at issue were clearly established and well defined." *Id*. at 907. Furthermore, "any reasonable officer in [school officer's] position would have known that her conduct was objectively unreasonable in light of such Fourth Amendment standards." *Id*.

*Harris* is distinguishable from this case. Unlike the police officer in *Harris* who made no "attempts to resolve the interaction without prompt

use of physical force", 499 F. Supp. 2d at 906, the video, deposition testimonies, and written reports show that Defendant Braziel eventually attempted to de-escalate the situation and gave Plaintiff a warning that if she did not comply he would use pepper spray on her. ECF No. 21-2, PageID.311 ("After exhausting all the de-escalation methods, Officer Braziel made an attempt to arrest [Plaintiff]."). In addition, the plaintiff in *Harris* "was compliant with [the police officer's] demands." *Harris*, 499, F. Supp.2d at 905. But here, Plaintiff was noncompliant during most, if not all of her interaction with Defendant Braziel. ECF No. 16-2, PageID.154. In her Citizen Complaint Form, written a day after the incident, Plaintiff described how "[Defendant Braziel] states to me [and] says he's going take my phone [and] I said no." *Id*.

Even though Plaintiff was merely noncompliant in the beginning of the interaction, her noncompliance evolved into active resistance when she sat on the ground in the corner, surrounded by school officials who were trying to get her to move, yet she refused to comply with Defendant Braziel's orders. She resisted when she was under Defendant Braziel's control, walked away from him when he temporarily released his control to confiscate her mobile phone, and was kicking and screaming after Defendant Braziel warned her that he was going to use pepper spray on her. Plaintiff's continued active resistance created a situation where

Defendant Braziel's use of force to bring her into compliance was not unreasonable. *See Eldridge*, 533 Fed. App'x at 535.

The Court thus finds that Plaintiff has not raised a genuine issue of material fact that she was actively resisting at this point in the sequence of events. Plaintiff's active resistance justified Defendant Braziel's escalation of force, including the use of pepper spray. Defendant Braziel is entitled to qualified immunity as to the third instance of force captured in the surveillance footage. *See* ECF No. 16-1.

### iv. Plaintiff claims that Defendant Braziel engaged in malicious prosecution.

Turning to the claim of malicious prosecution, Defendant Braziel argues that he is not liable because the police report he submitted to the prosecutor was truthful and that he did not make the decision to bring charges. ECF No. 16, PageID.138-39. Plaintiff responds that Defendant Braziel completed the police report for the purpose of initiating a prosecution against her and that the information he submitted contained "numerous false statements." ECF No. 21, PageID.300.

Malicious prosecution claims against a police officer will not stand when he provided truthful information and had no role in the decision to bring charges. In *Kinkus v. Village of Yorkville, Ohio*, the plaintiff was a village councilman who was acquitted of disorderly conduct after a bench trial in state trial court. 289 Fed. App'x 86, 89 (6th Cir. 2008). After his acquittal, he brought § 1983 claims against the arresting officers and the

33

municipality for malicious prosecution. The Sixth Circuit reversed the district court's denial of the arresting officers' motion for qualified immunity. The court held that "a police officer cannot be liable for Fourth Amendment malicious prosecution when he did not make the decision to bring charges, as long as the information he submitted to the prosecutor is truthful." *Id*. at 91 (citing *Skousen v. Brighton High Sch.*, 305 F.3d 520, 529 (6th Cir. 2002) and *McKinley v. City of Mansfield*, 404 F.3d 418, 444 (6th Cir. 2005)).

In *Kinkus*, the officers "had no role in choosing to prosecute" the plaintiff. Prior to the charging decision, the officers' actions "consisted only of completing a police report, signing a blank criminal complaint form that did not recommend any particular charge, and soliciting a written report from [another officer]." *Id*. Moreover, there was no evidence that the officers "ever consulted with or pressured Prosecutor Thomas to file charges." *Id*. Next, the court determined that the police report did not contain false information. The facts "were substantiated by the factual findings of the trial judge." *Id*. Therefore, the plaintiff could not contest the accuracy of the police report, "which served as the basis for Prosecutor Thomas's decision to bring the disorderly conduct charge." *Id*.

Here, Plaintiff has not offered evidence that Defendant Braziel did anything more than complete a police report. The fact that Plaintiff and

Defendant Braziel offer conflicting versions of the events, and that Braziel's report may reflect his version, does not establish in any way that the report is false. Moreover, in light of the surveillance footage, ECF No. 16-1, Plaintiff's cannot establish that Defendant Braziel was not truthful in drafting the report. Even filing a police report with the knowledge that it would be used for prosecution is not enough to suggest that Defendant Braziel made the decision to prosecute. And the Court could not find authority supporting the proposition that a police officer who merely prepares a report used in the prosecution is akin to "having a role in choosing to prosecute." *See Kinkus*, 289 Fed. App'x at 89.

Taking the evidence in the light most favorable to Plaintiff, the Court concludes that Defendant Braziel did not violate Plaintiff's right to be free from malicious prosecution. There is no evidence that Defendant Braziel did more than merely complete a police report or that he attempted to influence the prosecutor's decision to file charges. Defendant Braziel is entitled to qualified immunity as to the malicious prosecution claim.

### b. Section 1983 claims against Defendant Detroit Public Schools.

Plaintiff argues that Defendant Detroit Public Schools, as a municipal entity, is liable for Defendant Braziel's constitutionally violative conduct because "customs or policies of the DPS were, at a minimum, a moving force." ECF No. 1, PageID.16. Plaintiff contends that

Defendant Braziel was acting under the district's policies and that the district ratified and approved his conduct. ECF No. 1, PageID.15-16. In addition, Plaintiff alleges that Defendant Detroit Public Schools was deliberately indifferent to training its officers. *Id.* Consequently, Defendant Detroit Public Schools should be liable for the unconstitutional actions of its police officer, Defendant Braziel.

Defendants argue that "Plaintiff has no evidence to raise a genuine issue of material fact that DPS through its deliberate conduct was the moving force behind the alleged injuries." ECF No. 16, PageID.134. Specifically, that Plaintiffs have not identified "any unlawful policy, practice, or custom" that would subject Defendant Detroit Public Schools to liability. *Id.*

Municipal government entities, like Defendant Detroit Public Schools, may be sued for constitutional deprivations under § 1983 pursuant to *Monell v. Dept. of Soc. Servs. Of New York*, 436 U.S. 658, 690-91 (1978). *Monell* states that municipal defendants are liable when "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation or decision officially adopted and promulgated by that body's officers" or is "visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Id.* In other words, the municipal defendant must, under color of policy or

custom, "cause" an employee to violate an individual's constitutional rights. *Id*. at 692. The municipal government's policy or custom must be the moving force of the constitutional violation in order to establish liability.

In the Sixth Circuit, to satisfy *Monell*, a plaintiff must "identify the policy, connect the policy to the city itself, and show that the particular injury was incurred because of the execution of that policy." *Garner v. Memphis Police Dep't.*, 8 F.3d 358, 364 (6th Cir. 1993) (citations omitted).

Here, Plaintiff has failed to identify a specific policy or custom that caused Defendant Braziel to allegedly violate her constitutional rights. Nor can the Court find in the record a single citation to department policy regarding use of force. Although Plaintiff relies on how Defendant Braziel admits in deposition testimony that he was acting pursuant to department policy, ECF No. 21, PageID.302, an admission that an action was pursuant to policy is not the same as actually identifying a policy and explaining how that policy encourages or allows constitutional violations. *See* ECF No. 16-5, PageID.220-21.

In a similar vein, Plaintiff submits a Detroit Public School Department of Public Memorandum that details and reviews the incident at issue. *See* ECF No. 21-2. In it, the report also concludes that Defendant Braziel's actions were "consistent with department policy." *Id*. at PageID.311. But this is also not the same as identifying a policy and

offering proof that the policy caused the constitutional violation. Rather, both examples are tantamount to bare conclusions. Because discovery has finished and Defendants have moved for summary judgment, yet Plaintiff has not identified an unlawful policy, custom, or practice, the Court is not able to engage in a *Monell* analysis as clarified in *Garner*.

Plaintiff again relies on *Harris v. City of Cadillac* for the proposition that a municipal entity is liable for its employee's violative conduct when it reviews his actions and concludes that his actions were "consistent with department policy." ECF No. 21, PageID.302 (citing ECF No. 21-2, PageID.311). In *Harris*, the district court held that "the City of Cadillac had a *de facto* policy of authorizing [defendant officer's] illegal conduct through absence of supervision" and then ratified the illegal conduct "by failing to receive a criminal complaint for referral to the Michigan State Police." 499 F. Supp. 2d at 907. (italics in original). The court explained, however, that it found *de facto* policy on the grounds that the municipality was aware of the officer's numerous prior instances of misconduct. *Id*. at 905-06. The officer "was suspended by the City of Cadillac at least four times between 1984 and November 1, 2004." *Id*. at 905. Moreover, the municipality had a *de facto* policy because "promptly after the pepper-spraying incident," the plaintiff "attempted to file a complaint with the City of Cadillac" regarding the officer's conduct. *Id*. at 906. But the record reflected that the municipality actively

stonewalled the plaintiff's attempts to initiate an investigation. For instance, the court pointed out that a "police officer refused to take her complaint and did not refer the complaint to the Michigan State Police for investigation." *Id.*

Here, the record shows that Defendant Braziel, unlike the officer with four suspensions in *Harris*, has never been "subject to any form of discipline of any nature" by Defendant Detroit Public Schools. ECF No. 16-5, PageID.220. In his deposition, Defendant Braziel testified that he always follows the customs and policies of his employer. *Id.* Although a Memorandum reviewing Plaintiff's Citizens Complaint Form concluded that "Officer Braziel's conduct to be proper," this is not the same as members of a municipal entity actively refusing to investigate complaints about an officer's possible misconduct. Rather, the Memorandum suggests that Defendant Detroit Public Schools investigated Plaintiff's complaint by reviewing the evidence, such as the surveillance footage, and assessed witness statements. *Id.* For this reason, Plaintiff has not shown that Defendant Detroit Public Schools had a *de facto* policy of failing to supervise Defendant Braziel and of allowing him "to continually engage in illegal conduct and then ratifying the misconduct." *See Harris*, 499 F. Supp.2d at 906.

Thus, Defendant Detroit Public Schools is entitled to municipal immunity under *Monell.*

### c. Intentional tort claims against Defendant Braziel.

Plaintiff further alleges that Defendant Braziel committed the following intentional torts against her: assault and battery, battery, malicious prosecution, false arrest, and intentional infliction of emotional distress. ECF No. 1, PageID.17-22.

Defendant Braziel raises the defense that as a police officer acting within the scope of his duties, he is entitled to immunity from tort claims under Michigan law. *Odom*, 482 Mich. at 480. Specifically, he argues that Plaintiff is unable to establish that he lacked good faith and acted with malice. *See id.* Defendant Braziel also claims that under Michigan statute, he is immune from tort liability for reasonable and necessary use of physical force in a school setting. *See* Mich. Comp. Laws § 380.1313 §§ 4(a) and (d).

Plaintiff responds that Defendant Braziel acted with malice because he "should have never seized Plaintiff in the first place." ECF No. 21, PageID.304. Plaintiff argues that she was complying with a school official's orders to use the stairs instead of the elevator after she was informed that her elevator pass had expired. *Id.* Plaintiff also disputes that Defendant Braziel is entitled to immunity from tort liability under § 380.1313 because she was not interfering "with the ordinary exercise of school functions, she had not refused to comply with a request to refrain

from further disruptive facts…and there was not a disturbance that was threatening 'physical injury to any person.'" *Id.* at PageID.305.

In *Odom v. Wayne County*, the Michigan Supreme Court considered "when a governmental employee is immune from liability for an intentional tort." 482 Mich. at 461. The plaintiff, accused of prostitution, filed suit alleging false imprisonment and malicious prosecution against defendant police officers, Wayne County, and the City of Detroit. *Id.* at 46. The defendants raised individual and governmental immunity as affirmative defenses. *Id.* As to the municipal defendant, the lower court granted summary disposition on the basis of governmental immunity. As to the individual defendant officer, however, individual immunity was denied because plaintiff alleged a negligent tort. *Id.* at 464-65. The Michigan Supreme Court vacated and remanded the proceedings in accordance with the proper inquiry for raising governmental immunity as an affirmative test, which is outlined below. A governmental employee raising governmental immunity as an affirmative defense must satisfy a three-part test:

a) The acts were undertaken during the course of employment and the employee was acting, or reasonably believed that he was acting, within the scope of his authority,

b) the acts were undertaken in good faith, or were not undertaken with malice, and

c) the acts were discretionary, as opposed to ministerial.

*Id.* at 480.

In this case, the record shows that Defendant Braziel is entitled to governmental immunity as outlined by the Michigan Supreme Court in *Odom*. Elements (a) and (c) are easily met here. As to the former, Defendant Brazil was acting during the course of employment as a police officer at Cass Tech High School and his actions fell within his discretion. According to his deposition testimony, he entered the scene because he heard Plaintiff act "disorderly with assistant principal." ECF No. 16-5, PageID.228. The record also shows that Defendant Braziel sought to detain Plaintiff because he believed that she had become disruptive to the school environment.

In addition, Defendant Braziel's actions were discretionary and not ministerial because he was a police officer who responded to a disturbance and used force at a level that he believed was appropriate for the situation. *Id*. at PageID.244 For instance, when asked whether he felt that it was necessary to pepper spray Plaintiff, Defendant Braziel answered yes. *Id*. The record also does not establish that Defendant Braziel's superiors directed him to the scene or controlled his actions.

The prong under *Odom* that requires greater analysis is whether Defendant Braziel's actions were undertaken in good faith or without malice. In reviewing the record, the Court concludes it shows that Defendant Braziel acted in good faith and without malice. *See Odom*, 482 Mich. at 474. The Michigan Supreme Court in *Odom* discussed this

element at length, defining lack of good faith "as malicious intent, capricious action or corrupt conduct." *Id*. (citations omitted). Furthermore, "willful and wanton misconduct is made out only if the conduct alleged shows an intent to harm or, if not that, such indifference to whether harm will result as to be the equivalent of a willingness that it does." *Id*. (citations omitted). Good faith "is subjective in nature" and "protects a defendant's honest belief and good-faith conduct with the cloak of immunity." *Id*. at 481-82.

Taking the record in the light most favorable to Plaintiff, the Court concludes that Defendant Braziel acted in good faith and without malice. He acted within the scope of his duties as a police officer when he arrived at the scene to investigate the disturbance in the school hallway. The assistant principal "had to raise his voice at [Plaintiff] when she put her cell phone headphones in as he questioned her about her attempt to board the elevator with an expired elevator pass." ECF No. 16-4, PageID.206. Plaintiff's behavior is corroborated by her own Citizen Complaint Form, which was written the day after the incident. ECF No. 16-2, PageID.153. She stated that after the assistant principal confronted her about attempting to use the elevator with an expired pass, "he continued to yell [and] I put head phones on to tune him out." *Id*.

It was only after Plaintiff disobeyed the assistant principal by putting on her headphones that Defendant Braziel "[came] over due to

43

the elevation of [assistant principal's] voice." *Id*. at PageID.154. Although there may be a question as to whether Defendant Braziel provided a warning before or at the same time that he used force, ordering Plaintiff to surrender her mobile phone and providing a warning tends to suggest good faith. Plaintiff even attests that Defendant Braziel warned her that he was going to take away her mobile phone and headphones and Plaintiff responded by failing to comply with his directions. ECF No. 16-2, PageID.154. (Plaintiff declaring that Defendant Braziel said "he's going to take my phone [and] I said no…at this he reached for my phone.").

Plaintiff offers no other proof that Defendant Braziel acted with malice, and instead only argues that Defendant Braziel "should have never seized the Plaintiff in the first place." ECF No. 21, PageID.304. But the Michigan Supreme Court explicitly addressed this argument when it held that a police officer is entitled to immunity so long as he acted in good faith with probable cause "'even though the arrest is subsequently found to be baseless.'" *Odom*, 482 Mich. at 474 (citing *Blackman v. Cooper*, 89 Mich. App. 639, 643 (1979)).

By acting dismissively towards the assistant principal when she was confronted and being noncompliant with Defendant Braziel's commands, Plaintiff's conduct was disruptive to the school setting. A review of the totality of the circumstances shows that Defendant Braziel

was attempting in good faith to stop the disturbance and detain Plaintiff, not to harm her. Unlike in the excessive force context, which courts analyze under an "objective reasonableness" standard, here Defendant Braziel is entitled to governmental immunity as to the intentional tort claims because there is no issue of material fact as to whether he acted in good faith. *Compare Odom*, 482 Mich. at 481-82 ("The good-faith element of the *Ross* test is subjective in nature."), *with Graham*, 490 U.S. at 399 ("The Fourth Amendment inquiry is one of 'objective reasonableness' under the circumstances, and subjective concepts like 'malice' and 'sadism' have no proper place in that inquiry.").

## CONCLUSION

For all the reasons detailed above, Defendants' motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**.

In particular, summary judgment is **GRANTED IN PART** to Defendants Braziel and Detroit Public Schools on the following Counts:

- As to Count I, summary judgment is **GRANTED** to Defendants as to the following specific claims raised under Count I under 42 U.S.C. § 1983:

  o The claim of excessive force and unlawful search and seizure against Defendant Braziel for using pepper spray on Plaintiff;

  o The claim of malicious prosecution against Defendant Braziel;

- The claim of an unconstitutional policy or practice against Defendant Detroit Public Schools;

- As to the following Counts as well, summary judgment is **GRANTED** to Defendant Braziel: Count II for common law assault and battery, Count III for common law battery, Count IV for common law malicious prosecution, Count V for common law false arrest, and Count VI for intentional infliction of emotional distress.

As to all of the above-specified claims under Count I, and all of the other above Counts, Defendant's motion for summary judgment is **GRANTED**, and the above-specified claims under Count I and the other Counts are **DISMISSED WITH PREJUDICE**.

Defendant Braziel's motion for summary judgment on the basis of qualified immunity is **DENIED IN PART** as to the following claims:

- As to Count I, summary judgment is **DENIED** to Defendant Braziel as to the following specific claims raised under Count I in violation of 42 U.S.C. § 1983:

  - The claim of excessive force and unlawful search and seizure against Defendant Braziel for using force against Plaintiff resulting in her falling to the ground by the stairway; and

  - The claim of excessive force and unlawful search and seizure against Defendant Braziel for using force against Plaintiff by causing Plaintiff to hit her head against the wall and fall to the ground.

As to the above-specified claims under Count I, Defendant's motion for summary judgment is **DENIED.**

**IT IS SO ORDERED.**

Dated: May 18, 2021                          s/Terrence G. Berg
                                             TERRENCE G. BERG
                                             UNITED STATES DISTRICT JUDGE